**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 23-5126**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CAROLEE BRADY HARTMAN AND ALL OTHER PLAINTIFFS, APPROX.
50 ADDITIONAL PLAINTIFFS,

*Appellants,*

DR. ZUZANNA J. DILLION, et al.,

*Appellees,*

v.

ANTONY J. BLINKEN, SECRETARY OF STATE AND ALL OTHER
DEFENDANTS, ONE ADDITIONAL DEFENDANT,

*Appellees.*

On Appeal from the U.S. District Court for the District of Columbia
Case No. 77-cv-02019-APM (Mehta, J.)

**FINAL BRIEF OF APPELLANTS CAROLEE BRADY HARTMAN *ET AL.***

Roger E. Warin
Lindsey Lang
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
rwarin@steptoe.com
llang@steptoe.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and Amici**

The Appellants are named plaintiffs Carolee Brady Hartman, Toura Kem, Luba Medina, and Josefina Martinez and intervenor plaintiffs Pushpa Agnihotri, Judith Ambrose, Nancy Coffey, Myra Converse, Sonya R. Davis, Patricia DeYoung, Claire Frankel, Lynn Goldman Bartlett, Jahanara Hasan, Lisa M. Heilbronn, Sheila M. Homan, Runthann Irish, Elsa Rael, Michal Shekel, Yolanda Marshall Tisdale, Carolyn Turner, Shirley Hill Witt, Pamela E. Woodard, and Donna L. Woolf.[1]  The Appellees are Antony J. Blinken, in his capacity as the Secretary of State of the United States of America, and Marc B. Nathanson of the Broadcasting Board of Governors.  There are currently no *amici* in Case No. 23-5126.

**Rulings Under Review**

Appellants seek review of a Memorandum Opinion and Order denying Appellant's motion for a lodestar enhancement that was entered by United States District Judge Amit P. Mehta of the United States District Court for the District of Columbia on March 31, 2023.  *See Hartman v. Blinken*, No. 77-cv-2019 (APM), 2023 WL 3366204 (D.D.C. Mar. 31, 2023), JA1586-JA1599.

---

[1] Counsel represented two additional plaintiffs who passed away before this appeal was filed: named plaintiff Rose Kobylinski and intervenor plaintiff Honora Rankine-Galloway.

**Related Cases**

Certain previous rulings in this matter (none of which involved the attorney fee issues raised in this appeal) were appealed as follows:

- *De Medina et al. v. Reinhardt et al.*, Nos. 81-1909, 81-1910, & 81-1911; affirmed in part and remanded in part, 686 F.2d 997 (D.C. Cir. 1982);

- *Hartman et al. v. Duffey et al.*, Nos. 92-5325 & 92-5347; remanded, 19 F.3d 1459 (D.C. Cir. 1994);

- *Hartman et al. v. Duffey et al.*, No. 95-5030; affirmed in part and remanded in part, 88 F.3d 1232 (D.C. Cir. 1996); certiorari denied, *Duffey et al. v. Hartman et al.*, 520 U.S. 1240 (1997);

- *Hartman et al. v. Kemble et al.*, Nos. 98-5540, 98-5541, 98-5542, 98-5543, 98-5544, 98-5545, 98-5546, 98-5547, & 98-5548; appeal dismissed voluntarily (Apr. 13, 1999);

- *Hartman et al. v. Albright et al.*, Nos. 99-5167, 99-5168, 99-5169, 99-5170, 99-5171, 99-5172, 99-5173, 99-5174, 99-5176, 99-5177, 99-5178, & 99-5179; appeal dismissed voluntarily (Nov. 4, 1999);

- *Hartman et al. v. Albright et al.*, No. 99-5379; appeal dismissed voluntarily (Dec. 29, 1999);

- *Hartman et al. v. Albright et al.*, No. 99-5406; appeal dismissed voluntarily (Jan. 6, 2000);

ii

- *Hartman et al. v. Albright et al.*, No. 99-5374; appeal dismissed voluntarily (Jan. 21, 2000);

- *Hartman et al. v. Albright et al.*, Nos. 99-5420, 99-5421, 99-5422, 99-5423, & 99-5424; appeal dismissed voluntarily (Feb. 17, 2000);

- *Hartman et al. v. Albright et al.*, No. 00-5091; appeal dismissed voluntarily (Mar. 29, 2000);

- *Hartman et al. v. Albright et al.*, No. 99-5375; appeal dismissed voluntarily (Apr. 20, 2000);

- *Hartman et al. v. Albright et al.*, No. 99-5175; appeal dismissed voluntarily (Apr. 28, 2000);

- *Whiten v. Powell et al.*, No. 00-5388; appeal dismissed for lack of prosecution (Feb. 9, 2021);

- *Dillon et al. v. Powell et al.*, No. 00-5356; appellants' motion for summary reversal denied and appellees' motion for summary affirmance granted, 2001 WL 410461 (D.C. Cir. Mar. 15, 2001); certiorari denied sub nom., 534 U.S. 1078 (2002);

- *Whiten v. Powell et al.*, No. 01-5043, appeal dismissed for lack of jurisdiction, 2001 WL 674281 (D.C. Cir. May 10, 2001); and

- *Hartman et al. v. Kemble et al.*, No. 98-5577; appeal dismissed voluntarily (Mar. 7, 2002).

## <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

GLOSSARY.................................................................................................. viii

JURISDICTIONAL STATEMENT ........................................................... ix

STATEMENT OF ISSUES PRESENTED............................................... ix

INTRODUCTION ........................................................................................1

STATEMENT OF THE CASE....................................................................6

I.     Factual Background ...........................................................................6

II.    Procedural History of the Application for Final Fee Award ........................12

STANDARD OF REVIEW .......................................................................18

SUMMARY OF ARGUMENT .................................................................19

ARGUMENT ..............................................................................................22

I.     The District Court Failed to Properly Apply *Perdue* .....................................22

     A.    Plaintiffs' Counsel Demonstrated Superior Lawyering Throughout the Case. ..............................................................22

     B.    *Perdue* Permits Enhancement Where the Lodestar Has been Calculated Using Single-Factor Seniority-Based Rates.....................27

III.   *Perdue's* Narrow Exceptions Permitting Enhancement Do Not Control the Reasonable Fee in this Contract Case........................................34

IV.   Stipulations Correcting Below-Market *Laffey* Rates Do Not Foreclose Enhancement of the Stipulated Lodestar.......................................43

V.    The Stipulated Lodestar Must be Enhanced Because it is Based on a Single-Factor Rate That Fails to Consider All Relevant Factors. .................47

CONCLUSION ...........................................................................................49

CERTIFICATE OF COMPLIANCE.......................................................51

CERTIFICATE OF SERVICE .................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adolph Coors Co. v. Truck Insurance Exchange*,
  383 F. Supp. 2d 93 (D.D.C. 2005)..................................................28

*In re Asarco, L.L.C.*,
  751 F.3d 291 (5th Cir. 2014) ...............................................40, 41, 42

*Baker Botts L.L.P. v. ASARCO LLC*,
  576 U.S. 121 (2015)........................................................................40

*Blanchard v. Bergeron*,
  489 U.S. 87 (1989)..........................................................................42

*Cave v. Scheulov*,
  64 A.3d 190 (D.C. 2013) .................................................................35

*Compton v. Alpha Kappa Alpha Sorority, Inc.*,
  No. 13–262 (RMC), 2014 WL 12675254 (D.D.C. Sept. 10, 2014) ..................44

*Covington v. District of Columbia*,
  57 F.3d 1101 (D.C. Cir. 1995).....................................................28, 29

*DeLoach v. Phillip Morris Cos.*,
  No. 1:00CV01235, 2003 U.S. Dist. LEXIS 23240 (M.D.N.C. Dec.
  19, 2003), *aff'd in part and rev'd in part sub nom*, *DeLoach v.
  Lorillard Tobacco Co.*, 391 F.3d 551 (4th Cir. 2004)......................................39

*Donahue v. Thomas*,
  618 A.2d 601 (D.C. 1992) ...............................................................39

*Evans v. Sheraton Park Hotel*,
  503 F.2d 177 (D.C. Cir. 1974)........................................................36

*Frazier v. Franklin Inv. Co.*,
  468 A.2d 1338, 1341 & n.2 (D.C. 1983) .........................................36

*Hartman v. Duffey*,
  973 F. Supp. 199 (D.D.C. 1997)........................................................3

*Hartman v. Pompeo*,
   No. 77-cv-2019(APM), 2020 WL 6445873 (D.D.C. Nov. 3, 2020)
   ................................................................. 11, 12, 13, 14, 24, 28, 48

*In re Home Depot Inc.*,
   931 F.3d 1066 (11th Cir. 2019) ..........................................................38

*James G. Davis Construction Corp. v. HRGM Corp.*,
   147 A.3d 332 (D.C. 2016) ............................................................35, 36

*Johnson v. Georgia Highway Express, Inc.*,
   488 F.2d 714 (5th Cir. 1974) ........................................ 26, 27, 35, 36, 38, 40, 41

*Perdue v. Kenny A. ex. rel Winn*,
   559 U.S. 542 (2010)
   .................................................. 4, 5, 12, 13, 18, 20, 21, 22, 23, 24, 25, 26, 27, 29,
                                              31, 32, 33, 34, 36, 38, 40, 41, 42, 48

*Price v. District of Columbia*,
   792 F.3d 112 (D.C. Cir. 2015)...........................................................18

*Sahrapour v. LesRon, LLC*,
   119 A.3d 704 (D.C. 2015) ..............................................................44

*Salazar ex rel. Salazar v. District of Columbia*,
   809 F.3d 58 (D.C. Cir. 2015)............................................................ 18

*In re Volkswagen & Audi Warranty Extension Litig.*,
   692 F.3d 4 (1st Cir. 2012)...............................................................34

*West v. Potter*,
   717 F.3d 1030 (D.C. Cir. 2013)..........................................................19

*Wing v. Asarco Inc.*,
   114 F. 3d 986 (9th Cir. 1997) ...........................................................39

**Statutes**

11 U.S.C. § 330(a)(3)...................................................................40

**Other Authorities**

Wesley J. Smith, FIGHTING FOR PUBLIC JUSTICE: CASES AND TRIAL
    LAWYERS THAT MADE A DIFFERENCE xii (2001) ..................................................3

# GLOSSARY

***Laffey* Matrix:**  The *Laffey* matrix was a schedule of hourly billing rates used as a proxy for the prevailing market rates for complex federal litigation in the District of Columbia for counsel without customary billing rates or who charged submarket rates for public service reasons.  *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *aff'd sub nom Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988). Those rates were updated annually by the Civil Division of the United States Attorney's Office for the District of Columbia to provide rates it would accept in civil rights cases where the federal government was ordered to pay fees.  The rates were adjusted based on the Consumer Price Index for the metropolitan D.C. area as published by the Bureau of Labor Standards.  The U.S. Attorney's Office discontinued use of the *Laffey* Matrix in 2015.

**LSI Matrix:**  The LSI matrix is a schedule of hourly billing rates used as a proxy for the prevailing market rates for attorneys for complex federal litigation in the District of Columbia as determined by updating the base rates in the *Laffey* matrix by Bureau of Labor Statistics inflation tables specifically for legal services.  The Legal Services Index showed that prices for legal services increased much more rapidly than consumer prices overall.  *See Salazar v. District of Columbia*, 123 F. Supp. 2d 8 (D.D.C. 1983).

***Teamsters* Hearing:**  Based on the Supreme Court case, *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), "*Teamsters*" hearings are held to determine the individualized relief to which class members are entitled after there has been a finding of class-wide liability.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this civil rights class action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.  This class action was resolved by Consent Decree entered in March 2000.  The Consent Decree stated that the plaintiffs "shall be entitled to reasonable attorneys' fees, expenses, and costs from the initiation of this case through the final distribution of amounts in the settlement fund or the final resolution of any issues that may arise under [the Consent] Decree, whichever is later."  JA0451 ¶ 8.

This appeal arises from a March 31, 2023 order denying an enhancement to the lodestar amount of attorney's fees sought by plaintiffs on the grounds of superior attorney performance and exceptional results.  Plaintiffs timely appealed this decision on May 25, 2023.  *See* Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction over this appeal from a final decision of the District Court under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED

Whether the District Court erred in as a matter of law in concluding that *Perdue v. Kenny A. ex. rel. Winn*, 559 U.S. 542 (2010) foreclosed any possibility for enhancement notwithstanding the voluminous and detailed specific evidence of superior lawyering and exceptional results that characterize this case.

## **INTRODUCTION**

After more than twenty-five years of grueling litigation with multiple appeals and trials, the plaintiffs have achieved the largest total award in the sixty-year history of Title VII—$508 million to the 1,100 members of the class and $557,000 per class member. In addition to record-setting monetary compensation, many class members were able to take advantage of hiring opportunities and pursue the careers that had been denied them.  Plaintiffs' success—unprecedented in Title VII litigation—was the result of class counsel's extraordinary performance. The final stage of this extraordinary case is the setting of a reasonable fee to adequately compensate plaintiffs' counsel for that extraordinary performance.

Supreme Court authority permits enhancement to the normal fees available to successful Title VII litigants to reflect the extraordinary results and attorney performance here.  Class counsel persevered against the most powerful and well-funded defendant in the world, the United States government—resistance that at times commanded the resources of the defendant agency's entire legal department as well as many U.S. Attorney's Office lawyers[2]—for more than twenty years,

---

[2] *See* JA0550-JA0552, Declaration of John D. Bates, attached as Exhibit A and JA0553-JA0560, Declaration of Alberto J. Mora, attached as Exhibit B to the Declaration of Bruce A. Fredrickson, ECF 1081-2.

achieving spectacular results through outstanding lawyering and sheer tenacity.[3]
Class counsel went without any fees for the first eighteen years of the case, and
then received periodic interim fees at below-market seniority-based lodestar rates.[4]
Throughout, plaintiffs preserved their right to seek enhancement of the lodestar
used to calculate interim fees at the conclusion of the case.

Decades of Supreme Court jurisprudence recognize that the lodestar may be
enhanced in *rare and exceptional* cases where outstanding results are achieved
through superior lawyering.  It would be difficult to find a more fitting "rare and
exceptional case" than this one.  Plaintiffs submitted detailed and specific evidence
on the magnitude of the record-breaking results, figures that were without peer at
the time of the settlement.  Class counsel received unreserved praise by the two
district court judges who for years presided over the merits of the litigation,
contemporaneously recognizing their superior lawyering that was the hallmark of
this extraordinary litigation, and the extraordinary result was front page news in the
New York Times and similar media outlets in the United States and worldwide.[5]
The "dedication, tenacity and skill" of class counsel were recognized by Trial

---

[3] The case is now in its fourth decade, but vigorous litigation ended in 2002.  It
took another sixteen years to secure the full extent of the relief embodied in the
Consent Decree.

[4] All interim fees have been paid.

[5] *See* JA1345-JA1346 and citations therein.

Lawyers for Public Justice by awarding class counsel the Trial Lawyer of the Year award for their work on behalf of the class of women discriminated against by their own government.[6]

In the first interim fee petition, the Special Master and the district court recognized that class counsel performed at levels well beyond attorneys with similar levels of experience, and achieved success remarkable for two lawyers during their first years in practice.  JA0279-JA0280; *Hartman v. Duffey*, 973 F. Supp. 199 (D.D.C. 1997).  At the fairness hearing approving this remarkable, unequaled settlement, the district court praised lead counsel's preparation, his mastery of the details of the case, his accuracy, and his responsiveness to questions from the court.  JA0144.  Throughout the case, the Special Master, charged with overseeing 48 *Teamsters* hearings and deciding the interim fee petitions, repeatedly praised class counsel, citing numerous specific examples of superior lawyering in face of massive opposition.[7]

---

[6] Wesley J. Smith, FIGHTING FOR PUBLIC JUSTICE: CASES AND TRIAL LAWYERS THAT MADE A DIFFERENCE xii (2001).

[7] One indication of the level of the government's resistance is the number of previous appeals of the case to this Court.  The government repeatedly, on virtually every adverse *Teamsters* hearing, appealed the Special Master's reports and recommendations to the district court and then appealed the district court's adoption of those reports to this Court.

The District Court recognized the "long and remarkable history" of this case, acknowledging the "resounding" success class counsel achieved and that the "lawyering and result were 'exceptional' by any metric as that term is ordinarily construed." JA1598-JA1599. All the prerequisites for a lodestar enhancement were present, yet the Court declined to award additional fees for lawyering which achieved extraordinary results far beyond that associated with seniority-based hourly rates. It erroneously concluded that it was foreclosed from considering an enhancement to the lodestar fees as the result of a stipulation entered by the parties that resolved the narrow issue of fees on fees. The Court specifically focused on the fact that the stipulation used a phrase— "true market value"—that also appears in *Perdue v. Kenny A. ex. rel Winn*, 559 U.S. 542 (2010). Based on the use of this phrase, and ignoring language in the same stipulation preserving the right to seek an enhancement, the District Court appears to have concluded that plaintiffs had agreed that they were not entitled to further enhancement for extraordinary results based on exceptional lawyering not reflected in a seniority-based matrix rate.

The Court erred in failing to read the parties' stipulation as a whole to give meaning to all of its terms. As had twenty-three previous stipulations resolving interim fees, the stipulation expressly included language stating that it was "without prejudice" to plaintiffs' position that they were entitled to enhancement of the lodestar due to exceptional results achieved through superior lawyering. By

reading the "true market value" language in the stipulation to foreclose enhancement under *Perdue*, violating basic principles of contract interpretation, the District Court did exactly what the stipulation prohibited—it read the "true market value" phrase *to eliminate plaintiffs' claim for a fee enhancement,* thus rendering meaningless the stipulation's reservation of rights to seek enhancement.

Ignoring the express reservation of plaintiffs' right to seek a lodestar enhancement in that same stipulation, the District Court erred in concluding that phrase in the stipulation limited its ability to consider the evidence of superior lawyering and other factors not subsumed in the single-factor seniority-based matrix rate. This case is precisely the sort of case in which *Perdue* contemplates an enhancement for superior results. And in any event, because plaintiffs' right to fees arose from the contractual agreement of the parties, and not from the federal fee-shifting statutes addressed in *Perdue*, strict adherence to that decision is not required here. Either way, the result should be the same. The decision of the District Court should be reversed and remanded.

## STATEMENT OF THE CASE

### I.    Factual Background

Forty-six years ago, a single victim of sex discrimination in hiring at the Voice of America sought justice.[8]  Mr. Bruce Fredrickson, a new associate at the firm of Hudson, Leftwich & Davenport, was assigned the case and drafted his first complaint.[9]  Over the next several years additional women joined the case and a class was certified.  Mr. Fredrickson became lead counsel and tried the liability case to the District Court and lost.  His firm declined to pursue the appeal, deeming the case unwinnable.

Mr. Fredrickson persisted.  When his firm abandoned the case, Mr. Fredrickson pursued it on his own for two years at great personal cost, working nights and weekends while also fulfilling his obligations as a full-time associate at the firm.  Mr. Fredrickson then formed his own firm to devote the time necessary to keep *Hartman* alive.  He won a reversal from this Court and then a favorable decision on liability.

---

[8] The Voice of America was a program within the United States Information Agency, a separate Agency of the United States government until 1999 when the parts of the Agency relevant to this lawsuit were incorporated into the State Department.  The Voice of America is now part of the U.S. Agency for Global Media.

[9] The source for the background information is the Declaration of Bruce A. Fredrickson, JA1274-JA1298.

Over the next sixteen years the case expanded to include over 1,100 class members and was, over that time, staffed by additional attorneys from other firms. Not a run-of-the-mill discrimination case, *Hartman* involved a world-wide class of women who spoke foreign languages and lived across the globe seeking positions in various job categories. Many candidates had to take a test to qualify for the position she was seeking, but the government mislaid, altered, and otherwise tampered with the test results. Many of the documents necessary to prove plaintiffs' case were missing, destroyed, or produced in a chaotic mess that defied organization. Class counsel had to overcome the chaotic mess produced by the government,[10] to organize and master such documents, and to identify when they had been altered.[11]

At a time when the litigation support industry was in its infancy, class counsel had to understand the over a million pages of documents produced by the government and use them to prove their case. One attorney for the class, Susan Brackshaw, created a database that allowed retrieval of specific, individualized documents that could be used to discredit government witnesses and defeat the defenses raised by the government. These documents were used to impeach many of the government's witnesses in the trials of claim after claim, leading to a success

---

[10] JA1472-JA1473, JA1497.

[11] JA1351-JA1358.

rate of 95% in 48 *Teamsters* hearings.  The Special Master noted that "the production arrived as a massive whole rather than as an organized, computerized, easily searchable set of materials," and marveled at class counsel's ability to master the disorganized mountain of documents produced by the government: "Plaintiffs' counsel have demonstrated a complete mastery of the facts surrounding each claim."  JA1472-JA1473, JA1497.

The government presented massive resistance.  It repeatedly challenged and appealed the Court's liability finding, class certification, and each adverse determination in a *Teamsters* hearing.  It vigorously contested plaintiffs' interim fee petitions, raising hundreds of objections to both hours and rates.  Class counsel persevered in face of this opposition, often working round the clock, to meet the attacks on all fronts.  *Id.*

Only through remarkable skill, strategic decisions, and painstaking efforts were class counsel able to prepare the case, ultimately overcoming the many defenses offered by the government and proving, in 48 *Teamsters* hearings, remedies exceeding an average value of $475,000 per class member.  These Herculean efforts are presented in detail in the Corrected Declaration of Susan L. Brackshaw in Support of a Lodestar Enhancement, JA1350-JA1371.  In brief, these efforts included:

- Quickly and deftly responding to the change in the law concerning class certification announced in *Gen. Tel. Co. of the Southwest v.*

*Falcon*, 457 U.S. 147 (1982). Based on *Falcon,* the government successfully appealed Judge Richey's conditional certification of the class. Class counsel promptly acted to preserve the case by finding additional class members to satisfy Rule 23's commonality and typicality requirements, satisfying the "rigorous review" mandated by the new Supreme Court precedent. Change in the law during the pendency of a case is a ground for awarding an enhancement.

- Successfully advocating for court-appointed damages experts in the Order of Reference, thereby avoiding an ongoing and repetitive battle of competing experts in the *Teamsters* hearings, and rendering the backpay awards to class members almost incontestable.

- Successfully advocating for a novel damages model based on the compensation and salary histories of the men actually hired for the jobs class members were denied because they were women, thereby affording class members the benefits of the career progression of these male applicants, in contrast to back-pay calculations based upon hypotheticals and salary schedules, common in most employment discrimination cases and advocated for by the government.

- Bringing a cross appeal on the pre-judgment interest rate issue (worth millions of dollars) when the government appealed nine adverse *Teamsters* hearing judgments to put pressure on the government to settle the case.

- Creatively instituting a "defense busters" project whereby defenses common to many class members' claims were identified and then selecting the order of *Teamsters* hearings based on the number of defenses that could be defeated categorically, rather than seeking to try the cases with the highest potential for damages first, as might be expected in other class actions. Efficiently defending the *Teamsters* Hearings by eviscerating government defenses was an effective response to the government's massive opposition.

JA1311-JA1313. The Special Master noted class counsel were "extraordinarily well prepared, both with respect to the documents they have selected to use during

Teamsters hearings and the examination and cross-examination of witnesses." JA1472-JA1473. "It is a remarkable achievement that Plaintiffs were able to take the mass of documents they were provided, to organize them and be able to present them as they did. No words that I write here will do justice to the enormity of the task Plaintiffs' counsel confronted." JA1501.

The success in 48 individual *Teamsters* hearings finally brought the government to the table. Class counsel secured an unequaled settlement for each class member. The global settlement of $508 million,[12] ultimately $638 million with interest for the two-year delay between the settlement agreement and the first distribution of funds, was the largest employment discrimination recovery in history, *more than double the previous record holder and today still stands as the largest Title VII recovery*.[13] The per capita award—over $557,000 for each class member and more for individuals with larger awards after their individual hearings—similarly dwarfed other awards before or since. To this day, no

---

[12] JA0448.

[13] The previous record holder was *Kraszewski v. State Farm Gen. Ins. Co.*, Civil Action No. C-79-1261 (N.D. Ca.), which settled for $259 million in 1992, with a per capita award of $318,181, and securing $65 million in attorneys' fees for class counsel. Since *Hartman* settled, the largest recovery in a Title VII case is the 2023 settlement for $215 million in *Chen-Oster v. Goldman Sachs, Inc.*, Case No. 10-6950 (S.D.N.Y.), with a per capita award of approximately $50,000 and $71.7 million in attorneys' fees. **The fees received by class counsel for the four decades of the *Hartman* litigation are $25 million.** Plaintiffs are seeking a multiplier for only the $19 million stipulated base lodestar.

employment discrimination case has garnered a more substantial recovery or even come close.

The magnitude of the recovery surprised even the district court judge who had overseen much of the proceedings. In approving the settlement, Judge Robertson praised Mr. Fredrickson, stating, "[i]n five and a half years, I've seen a lot of lawyers present cases. I don't think I have ever seen a lawyer who is more prepared, more ready to offer precise detail, more ready to respond to questions from the Court, and more dead on accurate than Mr. Fredrickson has been." JA0144. The District Court below noted plaintiffs' "extraordinary dedication to their clients' cause," *Hartman v. Pompeo*, No. 77-cv-2019 (APM), 2020 WL 6445873, at *2 (D.D.C. Nov. 3, 2020), and characterized the success as "resounding" and the lawyering as "exceptional by any metric, as that term is ordinarily construed." JA1598-1599.

The Consent Decree memorializing the settlement, which governs the fee award, provides that plaintiffs are entitled to reasonable attorneys' fees from "the initiation of this case through the final distribution of amounts in the settlement fund or the final resolution of any issues that may arise under this Decree, whichever is later." JA0451, ¶ 8.

## II.     Procedural History of the Application for Final Fee Award

The case was reassigned to District Judge Mehta in 2019.  Plaintiffs first moved for a final fee in 2019 after the last payment to an individual claimant.  In their 2019 motion plaintiffs sought additional fees based on two distinct theories.  First, plaintiffs sought a final fee based on 7.83% of the total recovery as updated to 2019 dollars.  JA0501-JA0510.  This percentage was consistent with percentages received in similar cases.  The District Court rejected this theory, holding that *Hartman* was not a common fund case and that the Consent Decree that governed the case contemplated fees based on a lodestar calculation.  2020 WL 6445873, at *1.

The second theory advanced by plaintiffs was that plaintiffs were entitled to a lodestar enhancement to reflect outstanding results due to superior lawyering.  JA0512-JA0520.  Plaintiffs provided specific evidence that *Hartman* was the rare and exceptional case warranting enhancement.  JA0511-JA0515.  Plaintiffs specifically noted that the use of single-factor *Laffey* rates established a basis for enhancement.  JA0516-JA0517.  *Perdue's* remedy is to adjust the lodestar to comport with what counsel would have received in a case not governed by a fee-shifting statute.  559 U.S. at 555.  Plaintiffs provided calculations to show that the "true market value" of their legal services was $75 million.  JA0519.  This would achieve a lodestar that would "approximate the fee that the prevailing attorney

12

would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue*, 559 at 551; JA0519.[14] These calculations used rates comparable to what litigators of complex federal litigation in the District of Columbia would receive based on the ninth decile rates contained in a rate survey approved by the U.S. Attorney's Office. *Id*. The $75 million lodestar derived from these market rates multiplied by the hours devoted to the case represented in a multiplier of 1.99 of the interim *Laffey*-based lodestar.[15] The District Court rejected plaintiffs' calculations, but agreed that the interim lodestar fees did not fairly compensate counsel.

The District Court found that the lodestar used in the interim petitions, based on rates found in the "USAO *Laffey* matrix did not keep up with market rates for complex litigation is Washington, DC." *Hartman v. Pompeo*, 2020 WL 6445873, at *13.[16] The District Court directed plaintiffs to prepare a revised lodestar using

---

[14] The methodology that resulted in the $75 million lodestar is described in detail in the Amended Declaration of Lindsey B. Lang, ECF 1082-2 at 10-17 (JA0590-JA0597) and Amended Exhibit D (JA0646-JA0649).

[15] The calculations supporting the $75 million lodestar are found at 1082-2, Exhibit D (JA0646-JA0649). The multiplier to the interim fee lodestar is found at 1082-2, Exhibit A (JA0598-JA0605).

[16] The District Court provided a succinct recitation of the history of the *Laffey* matrix and the newer LSI matrix, the two matrices in use in the District of Columbia as a proxy for the rate component for counsel without established billing rates. Both *Laffey* and LSI are lodestar schedules based on only a single factor—years since admission to the bar. As the Court detailed, the *Laffey* matrix was developed in 1983 and updated annually using the Consumer Price Index for

the LSI matrix to update the below-market *Laffey* rates, prepare arguments and data on interest rates, and identify "a factor that the lodestar does not adequately take into account and prov[e]with specificity that an enhanced fee is justified." *Id.* at *19.

Plaintiffs submitted a supplemental memorandum with calculations based on the LSI matrix. JA1190-JA1208. Because the new lodestar was also based on a matrix considering only the single factor of years since graduation from law school, plaintiffs presented evidence and argument that a multiplier was required to adequately compensate counsel.

At a status conference, the District Court encouraged the parties to agree on a firm number for the lodestar before it would consider a multiplier. The substance of the status conference confirmed that the parties and the District Court recognized that agreement on a lodestar was a prerequisite to determining whether an enhancement was appropriate and how much.

Responding to the Court's charge thus became a two-part process. The parties were able to stipulate to rates that did not suffer the same inadequate

---

Urban Consumers in the Washington metropolitan area. In 1993 a new matrix was introduced, taking the underlying data in the *Laffey* matrix but updating it using the Legal Services Index of the Bureau of Labor Statistics to adjust for inflation. *Hartman v. Pompeo*, No. 77-cv-2019 (APM), 2020 WL 6445873, at *11-12 (D.D.C. 2020). Because the inflation in billing rates exceeded the inflation in all goods and services, the LSI rates are higher.

inflation adjustment that plagued the *Laffey* matrix, as well as compensation for the delay in receiving them.  But this revised lodestar was still based on a matrix that considered only years of experience, failing to consider the other factors relevant to a reasonable fee for the outstanding success due to superior lawyering demonstrated throughout the case.  The parties were not able to compromise on the second part of the Court's charge—enhancing the matrix lodestar to reflect the superior lawyering and unequaled results achieved in this extraordinary case.

Over the next eighteen months, the parties negotiated a series of stipulations that resolved the below-market *Laffey* rates and improper interest calculations left open by after the Court's November 2020 Memorandum Opinion.  JA1211-JA1212.

In October 2021, the parties stipulated that the government would pay plaintiffs additional fees to compensate for the below-market hourly rates used in the interim petitions for twenty years, as well as an additional amount to compensate for the delay in receiving the shortfall.  It further provided for compensation to make up the difference between the post-judgment interest paid on the interim petitions at the 1-year Treasury bill rate and the prime rate.  The additional amount for these three elements totaled $9,033,600.  The District Court incorrectly referred to this payment as an additional $9 million in lodestar fees.  JA1587.  In reality, the additional lodestar was $2.4 million and the rest was

interest.  The stipulation specified that it was "without prejudice to either party's position with respect to enhancement of the lodestar for superior attorney performance and exceptional results."  JA1211-JA1212.

This second stipulation, agreed to in March 2022 and entered by the Court in April 2022, only concerned "fees on fees" for the work of fee counsel in securing the $9 million payment.  The government agreed to pay $400,000 for work performed or costs incurred by fee counsel between November 1, 2017 and October 7, 2021.  JA1215.  Although this stipulation, which dealt exclusively with resolving the fees on fees issue, was a compromise of the fees on fees incurred, the government inserted language that "the parties further stipulate that, through this stipulation and the stipulation entered by the Court on October 1, 2021, they have completely and finally resolved any claim for fees or costs based on a contention (1) that Plaintiffs' receipt of fees was unreasonably delayed, (2) that the lodestar fees Plaintiffs have been paid did not reflect counsel's true market value, and (3) that the interest paid on interim fee awards in this litigation was insufficient."  *Id*. The next sentence reiterated that the stipulation was "without prejudice to either party's position with respect to whether an enhancement is warranted based upon Plaintiffs' alleged exceptional success as a result of superior lawyering."  *Id*.

The third stipulation embodied the parties' agreement concerning the base lodestar to be used in the anticipated enhancement motion.  "The parties have

16

entered this stipulation so that they and the Court can focus solely on the issue of whether the plaintiffs are entitled to an enhancement of the stipulated lodestar and, if so, how much." JA1219-JA1220. In other words, the stipulation preserved the issue of whether *Hartman* was the rare and exceptional case where superior lawyering produced outstanding results. The stipulated lodestar to be used in the consideration of an enhancement was based on the LSI matrix rates calculated pursuant to the Court's November 2020 order. The stipulation enabled the Court and the parties to avoid litigation over specific hours or hourly rates, focusing instead on the factors not considered in reaching the interim lodestar amounts, and the specific evidence of superior lawyering that plaintiffs would submit with their motion. This stipulation was also entered in April 2020.

At the same time that it approved these stipulations, the District Court set a briefing schedule for the enhancement motion. JA1217-JA1218. Thus, there is no doubt that both parties understood that the merits of plaintiffs' claim that they were entitled to enhancement of the lodestar for outstanding results achieved through superior lawyering would be litigated, and the Court was made aware of this expectation.

Plaintiffs filed their motion for enhancement of the lodestar in May 2022. In briefing, both parties agreed that while case law on fee-shifting statutes might provide guidance, it did not bind the Court, given that this case involves fees

17

awarded pursuant to the contractual agreement embodied in the Consent Decree. JA1313 at n.15. Plaintiffs contended in their motion that "Supreme Court jurisprudence is not binding on the court's exercise of discretion to award a multiplier." *Id*. The Government agreed, stating that "precedents involving fee-shifting statutes do not directly control here." JA1393.

Addressing the enhancement issue for the first time, on March 31, 2023 the District Court denied any enhancement without argument. Despite recognizing that this case is governed by the parties' settlement agreement (*i.e.*, the Consent Decree), JA1590 at n.6, the District Court nevertheless treated *Perdue v. Kenny A.*, 559 U.S. 542 (2010) as binding and dispositive. The Court relied almost exclusively on *Perdue*, citing or referring to it 32 times in the opinion. The Court cited no cases outside the federal fee-shifting arena. The District Court also read the language regarding "true market value" in the fees on fees stipulation as precluding reliance on *Perdue's* provision for enhancement of a lodestar fee based on a single factor rate which fails to measure counsel's true market value. JA1593. Deeming that avenue foreclosed, the District Court denied the motion.

## STANDARD OF REVIEW

This Court reviews "*de novo* whether the district court applied the correct legal standard" in resolving a dispute regarding attorneys' fees. *Salazar ex rel. Salazar v. District of Columbia*, 809 F.3d 58, 63 (D.C. Cir. 2015); *Price v. District*

18

*of Columbia*, 792 F.3d 112, 114 (D.C. Cir. 2015) (citing *Conservation Force v. Salazar*, 699 F.3d 538, 542 (D.C. Cir. 2012)). In addition, all other "questions of law decided in the process of determining an award [are reviewed] *de novo*." *West v. Potter*, 717 F.3d 1030, 1033 (D.C. Cir. 2013) (citing *Almerfedi v. Obama*, 654 F.3d 1, 5 (D.C. Cir. 2011)).

<u>**SUMMARY OF ARGUMENT**</u>

The District Court erred as a matter of law when it ruled that it could not enhance plaintiffs' fee award based on superior lawyering and outstanding results. Plaintiffs have proved their case and are entitled to a lodestar enhancement. The settlement achieved in this case was (and still is) the largest in Title VII history, and includes record-breaking individual payments for over 1,100 claimants based on complex individual remedial hearings. To achieve these extraordinary results, counsel had to overcome the inherent undesirability of a case of this magnitude and duration after an initial loss at the district court. Prosecuting the case on your own as a junior attorney outside of business hours is remarkable. To do it in addition to a full-time job is astounding. But for Mr. Fredrickson's skill and dedication, there would be no record-breaking success. Achieving the monumental settlement was not just a matter of hours worked. It was a matter of strategy and skill mastering mountains of documents and information which led counsel to prevail in 48 *Teamsters* hearings.

19

A lodestar enhancement is permitted in these circumstances for several reasons.  First, *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010), held that there are certain instances where superior attorney performance is not adequately accounted for in the normal lodestar calculation.  Most relevant here, an enhancement for extraordinary results is permitted where "the hourly rate is determined by a formula that takes into account only a single factor (such as years since admission to the bar) or perhaps only a few similar factors."  *Id*. at 555.  Specifically, plaintiffs are entitled to an enhancement because the rates used in the interim fees awarded to date were based on the *Laffey* matrix where only the number of years that each attorney had been in practice is considered, and then corrected for inadequate inflation adjustment by the LSI matrix, based on the same single-factor criteria.  This is precisely the circumstance contemplated by *Perdue*—where the attorneys achieve superior results, and the lodestar calculation is based only on the seniority of the lawyers involved, an enhancement is permitted to achieve a "reasonable" fee that reflects that success.

The District Court erred as a matter of law in holding it was barred from granting an enhancement based on plaintiffs' extensive evidence of superior lawyering by class counsel.  JA1592.  Despite that evidence and the District Court's own previous conclusions that this case is "in all respects extraordinary," that class counsel achieved "resounding" success, and that the "lawyering and

20

result were 'exceptional' by any metric as that term is ordinarily construed."
JA1598-JA1599.  The court erroneously held that it could not enhance the fee
under *Perdue.*  JA1599.  It did so as a result of its misconstruction of a fee
stipulation between the parties, meant to address the narrow issue of fees on fees,
to foreclose an enhancement.  But the very same stipulation expressly reserved the
question of fee enhancements for superior results, explicitly stating that the
stipulation was "without prejudice to either party's position with respect to
enhancement of the lodestar for superior attorney performance and exceptional
results."  The District Court's ruling failed to read the fees on fees stipulation in
the context of Plaintiffs' *repeated reservations* of right to litigate the question of
fee enhancements and failed to give meaning and effect to this critical reservation
(repeated again in the fees on fees stipulation).

The District Court further erred in holding that *Perdue* was binding on this
case in the first place.  The fee determination here is governed by the Consent
Decree, not federal fee-shifting statutes, and the Consent Decree requires *only* that
the fee be reasonable.  Decades of jurisprudence both in this Circuit and under
D.C. state law have discussed and defined a "reasonable attorney's fee" and that
caselaw permits a district court to exercise discretion to enhance the lodestar in the
rare and exceptional case where superior lawyering produces outstanding results.
But the governing District of Columbia law does not limit a District Court deciding

an enhancement motion to consider, as the District Court did here, only the narrow situations identified in *Perdue* where enhancement might be appropriate, rather than considering all factors relevant to determining a reasonable fee.  Proper consideration of all of the relevant factors supports an enhancement here.

The case should be remanded to require the District Court to consider such an enhancement.

## **ARGUMENT**

## I.    **The District Court Failed to Properly Apply *Perdue***

In *Perdue*, the Supreme Court reaffirmed the rule that an attorney's fee under federal fee-shifting statutes may be enhanced in extraordinary circumstances to compensate for superior performance and results.  559 U.S. at 546.[17]  In the rare and exceptional case of outstanding success due to superior lawyering, the lodestar may be enhanced when it fails to reflect all the factors that go into the determination of a reasonable fee.  This is precisely the situation here.  The District Court erred in holding that *Perdue* foreclosed any consideration of enhancement.

### A.    **Plaintiffs' Counsel Demonstrated Superior Lawyering Throughout the Case.**

This case easily fits the criteria for a success enhancement.  Initially, there must be superior results.  The largest monetary award, both total and per capita, for

---

[17] As set out below, the District Court erred in treating *Perdue* as binding, given that *Perdue* addressed a statutory fee award.

an 1,100-member class of victims of discrimination in the history of Title VII easily qualifies as superior results.

Achieving these results must be due to superior attorney performance. *Perdue,* 559 U.S. at 554. This was not simply a representation for Mr. Fredrickson—it was a lifelong, career defining commitment, spanning more than 40 years. Despite seemingly insurmountable obstacles, Mr. Fredrickson refused to abandon the goal of justice for his clients and pursued the case outside the already heavy work load in his office. Then Ms. Brackshaw created a database out of a massive and unorganized document production that identified altered test results and fraudulent hiring practices. The mastery of the tens of thousands of documents dealing with different job responsibilities throughout the world allowed plaintiffs to defeat the government's routine practices defense, relied on to defend many of the individual claims. Winning **95% of 48 *Teamsters* hearings** and securing unequaled awards for forty-six individual claimants clearly demonstrates superior lawyering not otherwise reflected in seniority-based lodestar rates.

Two district court judges and a Special Master confirmed this assessment of counsel's extraordinary skill. Even the District Court below, which did not have the advantage of a front row seat to this arduous litigation, recognized the "remarkable" contribution of Mr. Fredrickson who took the case as "a 26-year-old

just one year out of law school and, now well into his sixties, has stayed with it for its duration."  2020 WL 6445873, at *1.

Plaintiffs submitted voluminous evidence of superior lawyering including detailed declarations by six members of class counsel's team, describing the area of the case each took responsibility for, noting the successful strategies pursued, and describing Mr. Fredrickson's leadership.  Plaintiffs submitted reports of the Special Master—favorable rulings on the merits of the individual claims that underwent the *Teamsters* process demonstrating class counsel's superior skill in bringing these complex claims to trial and also reports recommending fees awards for the seven litigated fee petitions praising class counsel's work.  This record satisfies plaintiffs' burden of producing "specific evidence" that supports an enhancement.  *Perdue*, 559 U.S. at 553.  This is the rare and exceptional case deserving enhancement.

This record is easily distinguishable from the record in *Perdue.*  In *Perdue*, the Supreme Court reversed the enhancement because the district court had failed to "provide a reasonably specific explanation for all aspects of the fee determination, including any award of enhancement."  559 U.S. at 558.  The Court specifically criticized the district court's reliance on a comparison of the plaintiffs' counsel's performance with other unnamed counsel as "impressionistic" and failing to provide "an objective and reviewable basis for fees."  *Id.*

24

Here there is an objective and reviewable basis for enhancement:  the largest recovery, both total and per capita, in Title VII history.  The record contains the District Court's many detailed observations of the superior quality of class counsel not just by one judge, but corroborated by four judicial officers.  The praise is tethered to specific examples of superior lawyering.  *Perdue*, 559 U.S. at 555.

Plaintiffs' evidence specifically linking outstanding performance by class counsel with the spectacular results achieved satisfies *Perdue's* requirement of reviewable evidence supporting the award.  A hundred pages of declaration testimony by class counsel, over 1,000 pages of Special Master reports documenting class counsel's superb handling of *Teamsters* hearings garnering top dollar for each claimant, and easily another thousand pages of reports and recommendations on the seven litigated fee petitions recommending full compensation for class counsel's exceptional quality of legal services are concrete evidence supporting the need for enhancement of a single factor seniority-based lodestar.  Quality of service does not exist in a vacuum.  It is measured in relation to the facts and circumstances of the case compared with other cases and results. The facts and circumstances of this case and the comparison with other cases fully support enhancement of the seniority-based lodestar.

*Perdue* acknowledged that a fee may be enhanced for extraordinary results, 559 U.S. at 553, in the "rare circumstances in which the lodestar does not

25

adequately take into account a factor that may be properly weighed in determining a reasonable fee." *Id.* at 554.

Plaintiffs presented detailed factual descriptions of the superior lawyering that led to the outstanding results in this case, identifying several factors that the interim lodestar did not adequately consider. Class counsel's "brilliant insights and critical maneuvers" are not reflected in the seniority-based hourly rates in the stipulated lodestar. JA1594. Plaintiffs' evidence identified six factors that have not been subsumed in the lodestar that are relevant and support an enhancement.[18] Any factor alone could support enhancement; all six confirm that the superior lawyering by class counsel that achieved such remarkable success should be reflected in the reasonable fee for this case. This can easily be achieved by multiplying the agreed upon lodestar by a factor. For example, Judge Richey enhanced the lodestar fees for Mr. Fredrickson and Ms. Brackshaw's work between 1980 and 1990 by 25%.

---

[18] These factors, articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), include: 1) mastering voluminous and complex documentary proof; 2) overcoming monumental resistance by the defendant; 3) overcoming extraordinary time limitations; 4) handling an undesirable case; 5) prosecuting a socially significant case; and 6) comparison with similarly exceptional cases. Each of the factors was presented with factual support from the record corroborated by the Special Master as well as case support where enhancements had been awarded based on the same factor.

The District Court's task is to review the specific evidence provided by the plaintiffs to ascertain whether their burden of showing that an enhancement is justified has been met. *Perdue*, 559 U.S. at 553. The District Court declined to review the specific evidence proffered by class counsel and decide the factual issues raised. JA1592. The District Court held that none of the factors identified by plaintiffs is a factor not subsumed in the lodestar, but cited no case that holds any of those factors subsumed. Of the twelve factors announced in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) as relevant to determining a reasonable fee, the Court and the caselaw identify only six that are subsumed in the lodestar.[19] The plaintiffs' evidence relating to other factors should have been considered.

### B.    *Perdue* Permits Enhancement Where the Lodestar Has been Calculated  Using Single-Factor Seniority-Based Rates

An enhancement is appropriate under *Perdue*'s "single factor rates" exception. For the life of this case, rates were determined by the *Laffey* matrix, which considers only law school graduation date in determining the rate. The District Court determined that, starting in 1998, those rates failed to mirror the market for complex federal litigation in the District of Columbia. *Hartman v.*

---

[19] *Perdue* identified the factors presumably subsumed in the lodestar:  the time and labor required; the novelty and complexity of the case; the skill requisite to perform the legal service properly; the experience, reputation, and ability of the attorneys; and the results obtained. *Perdue*, 559 U.S. at 553.

*Pompeo*, 2020 WL 6445873, at *14. At the District Court's instruction, plaintiffs updated the lodestar for 1998 onward using another matrix—the LSI matrix which follows the same process as *Laffey* in assigning rates based on years since law school graduation.

For counsel without customary billing rates, the development of fee matrices provided a useful starting point for fee petitioners in the District of Columbia. *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995). The D.C. U.S. Attorney's Office adopted the *Laffey* matrix, updated it annually, and accepted it as evidence of the prevailing market rate for fee-shifting cases where the federal government was liable for fees. Rather than disputing the U.S. Attorney's proposed market rate, these attorneys would often agree to *Laffey* rates to avoid the expense of litigating over rates.

The matrix rate became a compromise to promote expediency. *See Adolph Coors Co. v. Truck Insurance Exchange*, 383 F. Supp. 2d 93, 98 (D.D.C. 2005). That happened in this case. After lengthy litigation over market rates in the first and second petitions, at the urging of the Special Master, plaintiffs agreed to accept *Laffey* rates as the baseline for their rates in subsequent *interim* petitions, but, critically, reserved the right to seek enhancement of the lodestar at the end of the litigation.

*Perdue* recognized that use of a matrix based on seniority as the only factor considered in determining the petitioner's rate does not consider the important factors deemed subsumed in the rate component of a lodestar—the skill, reputation and experience of counsel, the quality of service, and the results achieved. 559 U.S. at 555. The matrix lumps together all attorneys based on law school graduation date in the District of Columbia without regard for their expertise, reputation in the subject area, past successes, skill in presenting the issues, or success on the merits of their clients' cases. Using single-factor seniority-based rates fails to distinguish the stars from the merely competent. Additionally, the matrix rates used here—initially the *Laffey* matrix and subsequently the LSI matrix—group attorneys into multi-year experience brackets, failing to account for the increasing levels of experience gained each year that are customary in the private bar. The D.C. Circuit has recognized that this practice renders the matrices "somewhat crude." *Covington*, 57 F.3d at 1109.

For example, an attorney seeking fees under the matrix will be locked into one rate for the fourth through seventh years of experience despite the fact that this is when associates are typically given more responsibility and gain measurable experience with each year. Again, attorneys are locked into one rate for eight years from their eleventh year since admission to the bar until their nineteenth year. This is a time when most attorneys are making great strides in their practice,

becoming partners and generating business.  To lock them into a single rate that does not change for eight years cannot reasonably reflect the market.  This is particularly true in a long-lasting case like this where counsel are effectively denied a raise for years at a time.[20]

Additionally, the matrix rates top out at twenty years of experience.  This assumes an attorney, who presumably graduates from law school in their mid-twenties, will only be able to command the same rate in their sixties, adjusted only for inflation, that they garnered in their forties.  The effect on compensation for counsel is profound.  For example, lead counsel Mr. Fredrickson, a 1976 law school graduate, received the highest *Laffey* rate for his legal services when he tried the first *Teamsters* hearing in June 1996.  Forty-eight hearings later, with a 95% success rate, he was still compensated at the same rate despite the additional skill and expertise acquired during the hearing process, and the resounding success achieved.  Similarly, Ms. Brackshaw, a 1982 law school graduate, was locked into the 11- to 19-year bracket from 1993 through settlement, despite her promotion to partner in 1993 and her skillful decimation of the government's defenses and witnesses' testimony during the hearings.

---

[20] The U.S. Attorney's Office has now introduced a new matrix that provides a rate for each year of experience, eliminating the brackets used in both *Laffey* and LSI.

When the method used to determine the hourly rate fails to consider the skill, expertise and reputation of counsel, when the quality of performance and the results achieved are not considered, then the rate component of the lodestar does not fairly compensate counsel.

When extraordinary results are achieved, *Perdue* allows an enhancement if the lodestar calculation does not encompass all of the factors that help determine the reasonable fee.  559 U.S. at 554.  The Court described a circumstance where the hourly rate used in computing the lodestar considers only a single factor, such as years since admission to the bar.  *Id.* at 555.  The record before the District Court plainly satisfied this standard for enhancement, as the matrix-based fees were calculated based on exactly that factor.  Such a matrix wholly fails to account for the extraordinary success achieved by Mr. Fredrickson here, especially when the groundwork for that success was achieved when he was recently out of law school, litigating the case on his own and with little outside support.  For example, the seniority-based rate locked Mr. Fredrickson's compensation to that of a junior lawyer when he was performing at a level far above the average junior associate.

The District Court nevertheless held that this basis for an enhancement was "plainly foreclosed" as a result of its misreading of one of the nearly two dozen stipulations entered by the parties in an effort to narrow their disputes over

attorneys' fees down to the single issue of whether such an enhancement is warranted.  *See* JA1592.

The District Court's reading is erroneous both on the meaning of the stipulation at the time it was entered, and on the stage of the litigation to which it applied.  After the Court's November 3, 2020 opinion, plaintiffs were charged with correcting the below-market rates that they had received and proposing a fee that would reflect the outstanding results due to superior lawyering.  This involved two distinct steps.  The first step was adjusting the below-market *Laffey* rates with rates that reflected the rise in billing rates over twenty years.  The second step was briefing plaintiffs' entitlement to a multiplier of that lodestar.  The stipulation at issue was part of step one.  Step two was yet to come, but was fully anticipated by the parties.

*Perdue* suggests that the corrected lodestar and the multiplier can be addressed together, multiplying counsel's hours by a rate that is comparable to the rate paid by a client in a comparable case not subject to fee-shifting.  Under those circumstances, the new lodestar would reflect the attorney's "true market value." That was not possible here, however, as the government adamantly opposed even the use of LSI rates, much less the significantly higher rates of a private attorney the caliber of class counsel here.  Instead the parties resolved by stipulation the

below-market lodestar with an updated matrix rate and then proceeded to step two, litigating the multiplier.

The parties recognized that substituting the submarket *Laffey* matrix rates with the LSI matrix rates for petitions eight through twenty-eight did not eliminate a claim for a quality/results enhancement as contemplated by *Perdue*.[21]  The updated lodestar agreed to by the parties was still based on a matrix that considered only one factor—years since admission to the bar—and expressly preserved the right of plaintiffs to seek enhancement to that lodestar to reflect that *Hartman* is the rare and exceptional case where enhancement to reflect outstanding success due to superior lawyering is appropriate.

The enhancement multiplier was the focus of plaintiffs' motion.  The parties had agreed to a base lodestar for the enhancement motion, allowing the Court to focus only on the factors not considered in the hourly rates and the evidence of superior lawyering submitted with the motion.  To fail to consider this evidence

---

[21] The District Court held that the fees for the first seven interim petitions, before the difference between the rate of inflation for goods and services in general and legal services became pronounced, reflected counsel's true market value.  JA1176.  Yet the fees reflected in the first petition were awarded a quality enhancement of 25% for some of the legal services reflected in that petition.  In awarding that enhancement, Judge Richey deferred any consideration of further enhancements to the conclusion of the case.  When the District Court here concluded that class counsel were paid their "true market value" for these first seven petitions, this merely reflected that *Laffey* matrix rates had not yet fallen behind the market for legal services.  It did not reflect a lodestar enhanced for exceptional results based on superior lawyering.

was error.  Because of that error, this Court should reverse the district court's fee

order and remand for the proper determination of a lodestar enhancement for

extraordinary results caused by outstanding lawyering.

## III.  *Perdue's* Narrow Exceptions Permitting Enhancement Do Not Control the Reasonable Fee in this Contract Case

*Perdue* cannot be read to foreclose a fee enhancement here for a more

fundamental reason: It does not control cases, like this one, where the right to the

fee arises by contractual agreement, rather than federal fee shifting statutes.  The

District Court acknowledged that "as a technical matter the fee here is governed by

a negotiated settlement, not Title VII's fee-shifting provision," JA1590 at n.6.[22]

Indeed, when fees are shifted pursuant to contract, the substantive law of the forum

applies.  *In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4, 15 (1st

Cir. 2012) (state law applies to interpretation of the settlement agreement).  Thus,

District of Columbia law, not federal case law arising under fee-shifting statutes,

controls the disposition of this case.  While the Court may look to federal law for

guidance, it is not binding.

---

[22] Initially, the District Court erred in stating that "the parties have *agreed* that caselaw regarding awards under fee-shifting statutes is applicable here."  JA1590 at n.6 (emphasis added).  The Court misstated the government's position, which stated that "precedents involving fee-shifting statutes do not directly control here." JA1393.  As noted at page 9 above, plaintiffs specifically stated that Supreme Court jurisprudence is *not* binding here.  JA1313 at n.15.

One of the ways that D.C. law differs from federal law is in considering enhancements for extraordinary results.  District of Columbia law considers all relevant factors in deciding the reasonable fee.  D.C. follows the American Rule that each party is normally required to pay its own costs of litigation.  "A court, nonetheless, may grant a request for attorney's fees from the other party when authorized by 'statutory authority' or 'contractual agreement' or by several common law exceptions."  *Cave v. Scheulov*, 64 A.3d 190, 193 (D.C. 2013).  When the right to fees is established by contract, the contract controls.  *James G. Davis Construction Corp. v. HRGM Corp.*, 147 A.3d 332, 339 (D.C. 2016).

A reasonable fee under D.C. contract law "is computed by first determining the so-called lodestar—the number of hours reasonably expended by counsel multiplied by a reasonable hourly rate—and then, 'in exceptional cases,' making upward or downward adjustments as appropriate."  *HRGM Corp.*, 147 A.3d at 346 (*quoting Fed. Mktg. Co. v. Va. Impression Prods. Co*., 823 A.2d 513, 530 (D.C. 2003).  While D.C. law is similar to the jurisprudence under federal statutory fee-shifting, at times looking to federal precedent for guidance, for example following *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  *Johnson* articulated twelve factors that courts should consider in determining a

reasonable fee. *Id.*[23]  The District of Columbia adopted the twelve *Johnson* factors in *Evans v. Sheraton Park Hotel*, 503 F.2d 177, 188 (D.C. Cir. 1974), and subsequent D.C. cases extended the factors to cases beyond the employment litigation in *Evans. Frazier v. Franklin Inv. Co.*, 468 A.2d 1338, 1341 & n.2 (D.C. 1983); *HRGM Corp.*, 147 A.3d at 346.

D.C. law has not adopted the portions of *Perdue* cited by the District Court finding various *Johnson* factors subsumed in the lodestar.  In fact, there are no fee cases in the District of Columbia that rely on *Perdue* at all.  Under D.C. cases, a court analyzes the question of enhancement for extraordinary results and superior lawyering by looking holistically at the range of factors explained in *Johnson, Evans* and *Frazier.*  Indeed, D.C. law permits consideration of any of the *Frazier* factors in arriving at the lodestar and considering *any* adjustments.  While not all of these potentially relevant factors are pertinent in every case, District of Columbia courts have not categorically eliminated any factor from the reasonable fee determination.

---

[23] The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client: and (12) awards in similar cases.

Applying D.C. law here, there is no doubt that this case deserves enhancement.  The results were exceptional, securing the largest Title VII recovery in history.  Substantial additional individual relief was awarded by adjusting retirement accounts. JA0567-JA0568, JA0572,  at ¶¶ 16-23, 47.  The record-setting outcome was a product of class counsel's extraordinary skill.  The strategy and skill employed by class counsel to produce the results rise far above those present in an ordinary case and are not reflected in fees based solely on seniority.  Seniority is not a surrogate for quality, and in cases of extraordinary success brought about by superior lawyering, an enhanced fee is required to fully compensate class counsel.

The main response the government made to claims of exceptional performance is that class counsel did just what any lawyer would do to advance their client's claims.  JA1419-JA1422.  In law, on the surface, many lawyers will undertake similar tasks.  But how well they perform, the skill applied, and results achieved can vary widely.  No case matches the results achieved by Mr. Fredrickson.  In this case, as in many others, the skill applied can be ascertained by the results achieved and by the judgment of other experts in the field. The presiding judges throughout the successful litigation of plaintiffs' claims saw the exceptional performance of class counsel here and so stated on the record.  Under

controlling D.C. fee-shifting law, there is little doubt that an enhancement to reflect exceptional performance is appropriate.

By contrast, in the limited context of federal statutory fee-shifting statutes, *Perdue* arguably takes a more restrictive view of when such enhancements are permitted. Reasoning that many *Johnson* factors are largely subsumed in the lodestar calculation in federal fee shifting cases, *Perdue* nevertheless concluded that, in rare circumstances, such an enhancement for extraordinary results and superior lawyering was permissible. But rather than look to the totality of the circumstances under *Johnson*, as D.C. courts have traditionally done, *Perdue* charges the fee applicant with identifying a factor that is not otherwise subsumed in the lodestar calculation and providing specific evidence that the lodestar fee must be enhanced to adequately compensate counsel. *Perdue* identifies only three instances where enhancement may be appropriate.[24]

While the Supreme Court jurisprudence in statutory fee-shifting cases can provide guidance in determining a reasonable fee, specific limitations imposed in federal statutory cases are not binding outside the federal fee-shifting area, as in contractual fee disputes. *See In re Home Depot Inc.*, 931 F.3d 1066, 1082 (11th

---

[24] Most relevant to this case, as discussed below, is *Perdue*'s first such circumstance regarding a lodestar calculated with a single factor rate. The eighteen-year delay before the first interim payment also falls within *Perdue*'s third exemplar.

Cir. 2019) ("We are not bound in a contractual fee-shifting case by statutory fee-shifting cases . . . ."); *Wing v. Asarco Inc.*, 114 F. 3d 986, 989 (9th Cir. 1997) (restrictions on enhancement for risk announced in *Dague* inapplicable as the fee-shifting is voluntary and contractual rather than statutorily-mandated); *DeLoach v. Phillip Morris Cos*., No. 1:00CV01235, 2003 U.S. Dist. LEXIS 23240 (M.D.N.C. Dec. 19, 2003) (use of lodestar does not convert case into pure statutory fee-shifting when fees are sought pursuant to private agreement among the parties), *aff'd in part and rev'd in part sub nom*, *DeLoach v. Lorillard Tobacco Co.*, 391 F.3d 551 (4th Cir. 2004).

For example, in *Donahue v. Thomas*, 618 A.2d 601 (D.C. 1992), where petitioner sought fees for his *pro se* services under the D.C. information act, the District of Columbia Court of Appeals *declined* to follow decisions of the D.C. Circuit allowing attorneys' fees to *pro se* litigants under the federal Freedom of Information Act. The federal cases put priority on FOIA's public purpose of furthering the national policy that favors disclosure of government documents, whereas the D.C. court prioritized the necessity of an attorney-client relationship before attorneys' fees could be awarded. *Id*. at 607.

In a non-statutory case, the limited circumstances allowing enhancement discussed in *Perdue* would not preclude the court from considering evidence warranting enhancement supported by other factors. This is precisely how courts

have treated *Perdue* in other disputes arising outside of the federal statutory fee-shifting context. For instance, the federal bankruptcy statute provides for reasonable compensation for attorneys and other professionals, 11 U.S.C. § 330(a)(3), authorizing payment of fees for work done to assist the administrator of the estate. Bankruptcy courts traditionally calculate the lodestar and then may exercise discretion to adjust the lodestar up or down based on the *Johnson* factors. *In re Asarco, L.L.C.*, 751 F.3d 291, 295 (5th Cir. 2014).[25]

Ascertaining the "reasonable fee" for debtors' counsel, the *Asarco* district court and the Fifth Circuit rejected applying *Perdue* strictly to limit the circumstances where extraordinary-result enhancements may be awarded. In *Asarco*, the Fifth Circuit affirmed enhancements to the lodestar for debtors' counsel in fraudulent transfer litigation for a judgment that was the largest in Chapter 11 history—a "once in a lifetime result." *Id.* at 296. "The court's calculation was based on 'rare and exceptional' performance and results in the adversary proceeding and a finding that the standard rates charged . . . were approximately 20% below the appropriate market rate." *Id.* at 294.

---

[25] The Fifth Circuit reviewed two elements of the fees awarded by the bankruptcy court and affirmed the lodestar fees and enhancement for the fraudulent transfer litigation and reversed the fees for defense of the fee award. The Supreme Court reviewed only the fees of defense award and affirmed the Fifth Circuit. *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121 (2015).

40

In upholding lodestar multipliers for extraordinary results, the court held that *Perdue* "did not overrule this circuit's bankruptcy precedent authorizing fee enhancements" under Section 330(a). *Id*. at 296 (*quoting In re Pilgrim's Pride Corp.,* 690 F.3d 650, 660-67 (5th Cir. 2012)). *Perdue* did not remove the discretion of the court to consider *Johnson* factors not subsumed in the lodestar and grant an "award significantly above the lodestar" when presented with "outstanding professional accomplishment in this case." *Id*. at 297 (*quoting In re Lawler*, 807 F.2d 1207, 1213 (5th Cir. 1987)). The court reached this conclusion notwithstanding the similarity of the inquiry in both contexts—determining a "reasonable" fee.

Like the findings related to the performance of the debtors' counsel in *Asarco*, counsel's services here "were instrumental in producing the exceptional results," addressing "an array of challenging legal issues with sophistication, creativity, and skill." 751 F.3d at 298. As in *Asarco*, the *Hartman* results were "nothing less than extraordinary." *Id*. Like debtors' counsel, *Hartman* class counsel achieved extraordinary success through "creativity, tenacity, and legal talent." *Id*. Similarly, debtors' counsel had to decipher "millions of pages of documents and us[e] those documents to tell a compelling story primarily out of the mouths of adverse witnesses." *Id*.

41

"It is central to the awarding of attorney's fees . . . that the district court judge, in his or her good judgment, make the assessment of what is a reasonable fee under the circumstances of the case." *Blanchard v. Bergeron*, 489 U.S. 87, 96 (1989). In affirming the bankruptcy court's enhancement, the Fifth Circuit noted that the court "could hardly have been more specific and detailed as to . . . [the] 'rare and exceptional' performance" of counsel in its recitation of circumstances of the case." *Asarco,* 751 F.3d at 298. Here class counsel provided similar detailed and specific evidence that the District Court erroneously felt constrained from considering. The Court erred in holding that, despite the exceptional lawyering and result, *Perdue* mandated that the Court could "do no more." JA1599.

Furthermore, after acknowledging that the fee is governed by the settlement agreement, the District Court applied the wrong legal standard, analyzing plaintiffs' motion under federal statutory fee-shifting law as limited by *Perdue*. The Consent Decree, which controls this case, requires only that the fee be "reasonable." In determining reasonable fees, D.C courts are not bound by federal decisions governing statutory fees. In following the strict letter of *Perdue* outside of the federal statutory fee-shifting context, the District Court erred as a matter of law. Its decision should be reversed on that ground alone.

42

**IV.     Stipulations Correcting Below-Market *Laffey* Rates Do Not Foreclose Enhancement of the Stipulated Lodestar.**

The District Court erred in relying in part on the language in the March 2022 stipulation resolving fees on fees, that the inflation-adjusted merits lodestar reflected "true market value," a term that was left undefined in the stipulation itself, and appears in no District of Columbia attorneys' fee decision.  This stipulation and each of the twenty-three preceding stipulations concerning attorneys' fees in this case contains a provision that the "stipulation is without prejudice to either party's position with respect to enhancement of the lodestar for superior attorney performance and exceptional results."  Referenced in the preceding stipulations and in the exact stipulation containing the phrase "true market value," the "without prejudice" language represents a vital component of the stipulation.

The March 2022 stipulation thus contains two provisions that, when read in isolation as the District Court did, may appear to be in tension.  If the statement concerning "true market value" had the meaning imputed to it by the District Court, the provision that the stipulation is "without prejudice" to plaintiffs' position that they are entitled to enhancement for superior lawyering and outstanding results would be meaningless.  This contradicts D.C. contract law, which requires courts to "give reasonable effect to all its parts and eschew an interpretation that would render part of it meaningless or incompatible with the

contract as a whole." *Compton v. Alpha Kappa Alpha Sorority, Inc.*, No. 13–262 (RMC), 2014 WL 12675254, at *2 (D.D.C. Sept. 10, 2014) (quoting *Abdelrnhman v. Ackerman*, 76 A.3d 883, 891 (D.C. 2013)).  The court must determine what a reasonable person in the position of the parties would have thought the conflicting language meant.  *Sahrapour v. LesRon, LLC*, 119 A.3d 704, 708 (D.C. 2015).  That determination requires consideration of the context in which the stipulation was entered.

Here the parties were resolving by stipulation those issues on which they could agree.  This stipulation itself addressed only fees on fees—that is the fees that fee counsel could recover for their work in obtaining the $9 million payment to class counsel updating the *Laffey* matrix rates with LSI matrix rates, as well as the delay and interest issues.  As such, that stipulation did not address fees that could possibly be subject to enhancement for superior lawyering and exceptional success.  Those fees were resolved by the earlier stipulation entered in October 2021, which made no mention of "true market value" but (like all of the stipulations entered by plaintiffs) preserved the right to seek enhancement of the lodestar.  The March 2022 stipulation concerned a $400,000 payment for the work of fee counsel.

This narrow stipulation was never intended and cannot logically be read to finally dispose of the enhancement issues which had been specifically reserved 23

44

times in the past. Instead, it had the limited purpose of settling the amount of fees on fees for the work of fee counsel in the four-year period prior to the stipulation. The district court's reading divorces the stipulation from its context. These provisions must be interpreted in light of the circumstances at the time of contract formation. It would be unreasonable to construe the true market value language as intending to preclude the very enhancement litigation that surrounding activity contemplated by the stipulation.

It is illogical to conclude, as did the District Court, that by agreeing to the phrase "true market value" in a stipulation related to fees on fees, plaintiffs abandoned their right to seek a lodestar enhancement. The District Court's singular focus on the "true market value" language resulted in exactly the prejudice the stipulation was designed to prevent. It makes little sense to construe such a stipulation broadly—and in conflict with nearly two dozen prior (and concurrent) reservations of rights by plaintiffs—to foreclose any enhancements for superior results based on superior lawyering. Plaintiffs had consistently reserved those rights in each of its stipulations with the government and carved them out from the discussions on narrowing fee disputes. Interpreting the phrase "true market value" to resolve the enhancement issue subjects plaintiffs to a preclusion of rights that they had consistently and expressly protected.

The "true market value" language can only be read in the sense that the parties had consistently used the term.  Throughout the litigation and before the stipulation, the parties used "true market value" repeatedly to refer to the fact that the unenhanced matrix rates used throughout the case for the interim fees were below the prevailing market rate for complex litigation in the District of Columbia. The thrust of this argument was, in calculating the basic lodestar (before any consideration of enhancements), the *Laffey* matrix failed to keep pace with rising billing rates in D.C.  *See* JA0482, JA0516, JA0517.  Prior to the stipulation, the government had consistently used the term in the same way.  JA1015, JA1019, JA1028.  In its November 3, 2020 Memorandum Opinion, the District Court referenced "true market value" to corroborate plaintiffs' claim that the *Laffey* matrix rates used in the interim petitions did not reflect prevailing market rates over the life of the case and thus failed to provide a fully compensatory fee. JA1148, JA1173, JA1175, JA1177, JA1181.  The phrase did not consider potential enhancements, but only the base lodestar rates for average non-extraordinary legal services or results.

As read by the District Court, this language conflicts with the repeated assertion that the piecemeal resolution of interim fee issues was without prejudice to plaintiffs' position on enhancement.  To imply that the compromise lodestar

resolved by the October 2021 stipulation satisfied both the lodestar and enhancement issues does not withstand scrutiny.

Given this context, the only reasonable reading of the phrase in the stipulation is that the parties were proceeding step by step to resolve issues on which they could compromise, as they reported to the court in multiple Joint Status Reports between January 2021 and March 2022, and then proceed to the final issue which would resolve the case once and for all – the issue of enhancement for outstanding results due to superior lawyering.  JA1217-JA1218.  It is simply unreasonable to conclude that by entering the fees on fees stipulation either party was prejudicing their position on enhancement.

## V.    The Stipulated Lodestar Must be Enhanced Because it is Based on a Single-Factor Rate That Fails to Consider All Relevant Factors.

A reasonable fee here should not be based solely on counsel's years out of school and on how many hours they devoted, but based on how successful and how persuasive their arguments were.[26]  Class counsel proved their worth by their performance and the outcome.

The use of seniority-based matrix rates for class counsel throughout the life of this litigation failed to provide adequate compensation for the superior legal

---

[26] Special Master Steven Saltzburg observed that counsel "performed at levels well beyond the standards of attorneys with such limited experience."  JA1241.  That observation alone should signal that the lodestar's "years of experience" measure is not a reasonable marker of the quality of representation here.

services that resulted in the record-breaking recovery for the class. Using seniority-based single-factor rates for the interim lodestar awards in this case satisfies *Perdue's* first exemplar. The superior quality of services was demonstrated, and praised repeatedly by the judicial officers overseeing the litigation, and entitles plaintiffs to an enhancement. An enhancement should have been awarded and the decision of the District Court should be reversed and remanded.

The compelling story of how class counsel achieved historic results was recognized by the District Court's pronouncement that this "case is in all respects extraordinary." *Hartman*, 2020 WL 6445873, at *1. In light of the unequalled success brought about here by the superb quality of lawyering recognized by the three District Court judges who handled this case over its 40 year history (and not seriously disputed by the government), when, if not here, would a quality of lawyering/success enhancement to a lodestar fee, as recognized by Purdue and earlier Supreme Court cases, for the rare and exceptional case ever be available?

Since *Hartman* settled nearly a quarter of a century ago, there has been no case that settled for $300 or $400 million, let alone the $600+ million resolution here. Only exceptional lawyering, the tenacity, skill, and strategy, could have achieved the largest Title VII recovery in history. It is rare for a junior associate to manifest the skill to successfully pursue an appeal when Mr. Fredrickson's firm

abandoned the case; it was exceptional to successfully overturn that original District Court verdict; it was remarkable that class counsel mastered and deftly used the chaotic discovery produced by the government to great effect, persevering for decades to overcome the massive delay and resistance of the Government. Class counsel's shrewdness to deflect the government's repeated challenges to the damages model and the insight to systematically overcome the government's defenses in the selection of test cases were critical to the outstanding results achieved. If this were a run-of-the-mill case that any competent attorney could have prosecuted, there would be other cases with similar results by now. Yet *Hartman* stands alone as a singular success, the rare and exceptional case for which enhancement has been preserved.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse the decision of the District Court.

Dated: April 17, 2024                    Respectfully submitted,

                                         STEPTOE LLP

                                         /s/ *Roger E. Warin*
                                         Roger E. Warin
                                         Lindsey Lang
                                         1330 Connecticut Avenue, NW
                                         Washington, DC 20036
                                         (202) 429-3000
                                         rwarin@steptoe.com
                                         llang@steptoe.com


                                         *Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with Rules 27(d)(2)(A) and 32(g) of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 32(e)(2)(C), I certify that this response has been prepared in a proportionally spaced typeface (using Microsoft Word, in 14-point Times New Roman) and contains 11,454 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

/s/ *Roger E. Warin*
Roger E. Warin

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 17, 2024, a true and correct copy of the

Plaintiffs-Appellants' Final Brief was served on all counsel of record via CM/ECF

electronic filing.

/s/ *Roger E. Warin*
Roger E. Warin